Robert K. **CELESTINEO** and Michael V. Costello, for themselves and all others similarly situated, Plaintiffs,

v.

Harry K. **SINGLETARY,** in his official capacity as Secretary of the Department of Corrections, Defendant.

Nos. 72–109–Civ–J–14, 72–94–Civ–J–14.

United States District Court, M.D. Florida, Jacksonville Division.

March 30, 1993.

William J. Sheppard, Law Offices of William J. Sheppard, Jacksonville, FL, and Sharon Jacobs Brown, Plantation, FL, for plaintiffs.

Jason Vail, and Kimberly J. Tucker, Asst. Attys. Gen., Dept. of Legal Affairs, Tallahassee, FL, for defendant.

## OPINION AND ORDER GRANTING FINAL JUDGMENT

BLACK, Circuit Judge.

### I. Procedural Background

This case began in 1972, when inmates Robert K. Celestineo and Michael V. Costello filed separate pro se complaints, alleging prison overcrowding and inadequate physical and mental health care. That year, the complaints were consolidated and amended by court-appointed counsel to assert Eighth Amendment violations, and a class was certified of all present and future Florida prison inmates. Over time, the parties entered into several settlement agreements on food services, overcrowding, and health care, which were subsequently ratified by court order.

Today, the case is before the Court upon the Special Master's Report and Recommendation on Case Closure (Report and Recommendation), filed on October 9, 1992. In his Report and Recommendation, the Special Master advised the Court that counsel for both parties have agreed that the Defendant, the Secretary of the Department of Corrections (Department), has come into no less than substantial compliance with the orders previously entered in this case. The Special Master recommended that the Court enter a final judgment in accordance with the specific terms outlined in the Report and Recommendation. The Special Master further recommended that, upon the entry of such a final judgment, the Court close this case.

Upon the filing of the Special Master's Report and Recommendation, and pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, the Court ordered notification to class members of the proposed final judg-ment's terms and established a time period within which they could file comments or objections to the Report and Recommendation. The Court directed the Defendant to post the Court's Notice of Proposed Stipulated Final Judgment and Closing of the Case (Notice) in accordance with the provisions and for the time specified in the Notice. The Notice stated that a copy of the Report and Recommendation, with all attachments, would be made available for inspection upon reasonable request by class members in every correctional institution housing inmates in the State of Florida. The Notice also provided that a reader would be made available for illiterate inmates. Finally, the Court established a time period for class members to file comments and objections to the proposed final judgment. *See* Order Regarding Notice To Class of Proposed Case Closure, entered on October 9, 1992.

Although there were some posting problems at a few institutions, which the Court directed be remedied, *see* Orders of December 15, 1992, and February 4, 1993, the period for class members to file their comments and objections to the Report and Recommendation expired on February 22, 1993. On March 5, 1993, the Court held a hearing for the purpose of considering the Report and Recommendation.

### II. The Hearing

Present at the hearing were the Defendant and his counsel, class counsel, the Special Master, the Monitor, Lieutenant Governor Buddy MacKay for the State of Florida, various other state representatives, and members of the Correctional Medical Authority (CMA).

At the hearing, the Court addressed the following issues:

A. Whether the class members had proper notice of the Special Master's recommendations concerning entry of a final judgment and closure of this case.

B. Whether the class members' objections alleging continuing problems with overcrowding and the delivery of physical and mental health care indicate that the Department is in substantial non-compliance with the orders entered in this case or demonstrate that the Defendant has a constitution-

ally inadequate system for the delivery of physical and mental health care to inmates within the custody and control of the Department.

C. Whether the Report and Recommendation should be adopted by the Court and its specific recommendations incorporated in a final judgment closing this case.

### A. Notice to Class

With regard to whether proper notice was given to the class members, the Court began by summarizing the posting process following the Court's Order Regarding Notice To Class of Proposed Case Closure, entered on October 9, 1992.

Upon the Monitor's notification of certain posting deficiencies, the Defendant filed a Notice on Posting of Notice to Class of Proposed Case Closure on December 4, 1992, in which he admitted that there were some posting problems at Baker Correctional Institution (Baker). On December 7, 1992, the Monitor filed a Monitor's Notice On Posting of the Notice of Proposed Stipulated Final Judgment and Closing of This Case, in which he confirmed the posting problems at Baker. On December 15, 1992, the Court ordered that these deficiencies be remedied and extended the period for posting by the Defendant and filing objections by the class members at Baker. This order also required that class counsel file any final objections about the Notice's posting by December 30, 1992.

After two extensions of time due to class counsel's illness, the final objections were filed on February 3, 1993. These objections centered on Glades, Marion, and Tomoka Correctional Institutions, as well as Florida State Prison. In order to advance the notice process, the Court assumed the validity of class counsels' objections and ordered the Defendant to remedy the alleged deficiencies. The Court also ordered the Monitor to inspect personally the affected institutions, so that he would have personal knowledge whether the remedial measures at each institution conformed to the Court's Order Regarding Notice to Class of Proposed Case Closure, in order for this case to proceed to a hearing on the merits of the Report and Recommendation. Finally, the Court provided an extension of time for class members at these institutions to file their objections to the Report and Recommendation.

Class counsel filed no further objections about posting. On March 5, 1993, the Monitor filed an affidavit regarding his observation of the remedial posting procedures.

At the hearing, Mr. Robert Cullen, the Monitor in this litigation, reported on his personal knowledge of the posting process and of the level of the Defendant's compliance with the Court's orders regarding posting. Mr. Cullen affirmed that the Defendant had addressed all deficiencies noted by class counsel and that, in his observation, the Defendant had complied with the Court's orders concerning posting. Class counsel confirmed that they had no further objections about the posting and that they also believed the Defendant had complied with the Court's orders in this regard.

Based upon these representations by counsel, and after review of the record, the Court found that all objections by counsel regarding notice had been adequately addressed by the Defendant and that the time for filing objections by counsel as to the Notice's form and substance had passed. The Court further found that the Monitor's affidavit and the record reflected compliance with all orders relating to posting. The Court now finds that class members had proper notice of the Special Master's recommendations regarding entry of a final judgment and closure of this case.

### B. Class Members' Objections

The Court then considered whether the individual class members' objections required it to reject the Special Master's recommendations regarding entry of a final judgment and closure of this case.

First, the Court noted that it received 346 letters from 815 members of the class at 40 different correctional institutions. Counsel for the parties had stipulated that these letters fell into six different categories, by which the Court considered the objections:

1. *Individual medical complaints.* Over 200 letters received from over 500 inmates complained of the medical care each had received. The parties agreed that these complaints do not indicate

systemic inadequacies in the Defendant's delivery of physical and mental health care and that the complaints can be addressed through the Defendant's certified inmate grievance procedure. Therefore, the Court will order the Monitor to furnish appropriate grievance forms to the inmates for their use in the certified grievance procedure.

2. *Health issues to be addressed by the CMA as part of its ongoing survey and oversight function.* The Court received 105 letters from 430 class members on this topic. Counsel agreed that the Court does not need to address any of these objections because they raise issues the CMA was formed to address and oversee. Assuming the CMA continues to operate as it presently does, and assuming the State of Florida continues to support the CMA's independence, the Court finds that these objections do not impede closure of the case.

3. *Systemic issues that would impede closure.* The parties agreed that none of the letters raises legitimate systemic issues that would impede closure.

4. *Letters pertaining to matters that are not applicable to the issues in this case.* Counsel informed the Court that these letters raise objections not relevant to the issues remaining in this case.

5. *Overcrowding.* The Court received 68 letters from 340 inmates raising the issue of overcrowding. The Special Master's Report and Recommendation stated that for the past several years the Defendant has been in no less than substantial compliance with the Overcrowding Settlement Agreement filed in 1979. No objections had been filed by counsel to this conclusion.

6. *Miscellaneous Objections.* The parties agreed that none of these miscellaneous objections would impede closure. They fell into six sub-categories, which the Court outlined at the hearing as:

a. notice;

b. damages;

c. requests to intervene;

d. requests for documents;

e. letters indicating satisfaction with the conditions and the care provided by the Department of Corrections; and

f. others, which are difficult to categorize but do not go to the issues in this case.

The Court finds that the class members' objections to the entry of a final judgment and closure of this case are all individual in scope, do not demonstrate that the Defendant has a constitutionally inadequate system for the delivery of physical and mental health care to the class members, and do not reflect systemic non-compliance with the overcrowding and physical and mental health care delivery settlement agreements previously filed in this case.

C. Special Master's Recommendations

The final issue addressed at the hearing was whether it would be appropriate and fair to enter a final judgment in accordance with the Report and Recommendation's terms and close this case. Dean Joseph R. Julin, the Special Master, presented his recommendations to the Court. The Court then inquired whether counsel for the parties agreed with the Special Master's recommendations, to entry of a final judgment consistent with those recommendations, and to not appeal the final judgment. Counsel agreed.

Class counsel expressed concerns, however, regarding: (1) possible changes in the manner in which the Defendant complies with the overcrowding settlement; (2) possible changes in the established medical line of authority in the Department; (3) the delivery of mental health care by the Defendant; (4) the CMA's continued independence and funding; and (5) the Defendant's continued commitment to the parties' Agreement of May 1991, which formed the basis for class counsel's belief that this case can be appropriately closed.

Several representatives of the Department and of the State of Florida were present to affirm that the Defendant and the state remain committed to the orders previously entered, to the Agreement of May 1991, and to the CMA as an independent and well-supported oversight and monitoring prison medical authority. These representatives includ-

ed Lieutenant Governor Buddy MacKay; Mr. Harry K. Singletary, Secretary of the Department; Dr. Gustave Roberts, Director of Mental Health Services for the Department; and Dr. Charles Mathews, the Department's Assistant Secretary for Health Services. Class counsel was satisfied with the representatives' commitments.

The Special Master's recommendation to close this case was in large part based upon his conclusion that the CMA is capable of performing the oversight and monitoring functions that the Court has performed for the last two decades. Dr. James Howell, the CMA's immediate past chairman, affirmed at the hearing that the CMA is capable of performing these functions, as long as it remains independent and receives adequate funding. The present chairman, Mr. H. Jack Floyd, also foresaw no impediments to the CMA's continued independence and effectiveness.

At the conclusion of the hearing, the Court stated it would enter an Order adopting the Special Master's Report and Recommendation and issue a final judgment closing the case.

### III. The Correctional Medical Authority

Prison system litigation developed in this country as a vehicle to effect systemic change in the conditions of confinement in correctional institutions. Plaintiffs' counsel and the courts have, over the years, developed effective mechanisms to prosecute this type of litigation, and many prison lawsuits have effected dramatic improvements in the correctional systems of various states.

It has been difficult, however, to terminate the litigation with reasonable assurance that the changes accomplished through the litigation will not erode in the near term. Most cases stay open indefinitely, and there has been a constant re-filing in those cases that have been closed.

To address this problem, the Court and Special Master sought to develop a mechanism to assure closure on a basis that would both avoid future litigation and institutionalize the changes achieved, without requiring the Court's continued involvement. The Court's concern was how to return control of correctional institutions to the state without

the strong likelihood of renewed federal litigation.

Various solutions had been considered in this litigation when, in 1986, Special Master Dean Julin conceptualized what would become the CMA. Thereafter, he and the Monitor outlined the features of an independent medical authority, designed to perform the oversight and monitoring functions that the Court had exercised for the last two decades. Such an entity was envisioned to replace the Court as the guarantor of continued compliance with the standards of physical and mental health care achieved by the Department during the litigation. The parties agreed to the creation, implementation, and funding of an entity to be known as the Correctional Medical Authority. That same year, the Florida Legislature codified the agreement in sections 945.602–.6035 of the Florida Statutes.

Over the course of the last six years, the Florida Legislature has amended and strengthened the original enacting legislation. Perhaps the most important of these amendments occurred in 1992, when the Legislature specifically provided that the CMA is to "assist in the delivery of health care services for inmates in the Department of Corrections by ... assuring that adequate standards of physical and mental health care for inmates are maintained at all department institutions." Fla.Stat. ch. 945.603 (Supp. 1992). While the original statute required that the CMA survey and report every other year on all major facilities operated by the Department, the 1992 amendments added that the Department "shall file a written corrective action plan with the [CMA]," *id.* ch. 945.6031(2), not more than 30 days after receipt of a CMA report. In addition, the CMA "shall monitor the department's implementation of corrective actions to be taken at each institution where deficiencies related to the department's provision of physical and mental health care services are found to exist by the [CMA]." *Id.* ch. 945.6031(3).

Finally, the 1992 amendments established a procedure for resolving disputes between the CMA and the Department over health care policy, budget, and related matters, which allows the CMA to ultimately pursue

its position with the Florida Cabinet. If the Cabinet decides in favor of the CMA's position, the Department must comply or the CMA may file a petition in state court for an order requiring the Department to comply. If the CMA does not file such a petition, the amendments provide that inmates may do so. *Id.* chs. 945.6035–.6036.

Additionally, the CMA has an indirect monitoring capacity over the Overcrowding Settlement Agreement. Through the CMA's oversight of the Department's Office of Health Services, and the statutory requirement of the Office of Health Services' involvement in certifying housing for occupancy, the CMA acts as a check on unconstitutional levels of overcrowding.

The CMA, with its independent board and professional staff, is a unique state effort to remedy the very difficult issues relating to correctional health care. The CMA's performance has been very impressive. For example, the CMA succeeded in having W–Wing, a widely-criticized psychiatric unit, closed when both federal and state courts had obtained only limited results. Additionally, the CMA has contracted for the design and implementation of the first truly system-wide quality assurance process in any department of corrections in the country. This process is expected to help assure a continued quality of care in Florida's prisons.

Most impressive has been the work of the CMA staff. On each site visit, the CMA seeks to assure itself that a community standard of health care is indeed available to the individuals housed in each facility reviewed. The survey reports developed by the CMA are excellent. As a result, the CMA's reports on physical and mental health care over the last two years have been carefully done and insightful. The reports have been so well-documented that the Department has not successfully challenged them. The CMA, presently well-staffed and supported by the state, has demonstrated its independence, competence, and ability to handle the issues litigated in this case in a manner unique in institutional litigation.

Federal supervision of state functions is a difficult feature of federalism. The federal courts have struggled for years to disentangle themselves from state functions without jeopardizing resolution of the basic constitutional issues achieved by the litigation. The CMA is an innovative solution to the recurring problem of institutionalizing the changes effected by prison litigation, thereby permitting termination of federal involvement. The CMA provides independent, objective verification of the Department's activities and actions.

Florida's creation of an independent state entity to address potential problems in the delivery of physical and mental health care, as well as in overcrowding, made it possible two years ago for this Court to relinquish the prison monitoring and oversight function it had performed for the last twenty years. *See* Order Relinquishing Physical Health Care Survey and Monitoring Responsibilities to the Florida Correctional Medical Authority, entered on December 11, 1990. Furthermore, the CMA's statutory responsibility to report to the Governor, the Cabinet, and the Florida Legislature gives it a moral and legal authority which, as long as it is appropriately funded and staffed, should make future involvement of the federal courts unnecessary in the Florida correctional system.

It is exemplary that a major state such as Florida, with its significant prison population, would take such a creative step. Without innovations such as the CMA, there is little hope for satisfactory withdrawal of federal supervision. Without that hope, many question whether it is appropriate for federal courts to begin supervision in the first instance. In contrast, with an effective mechanism ultimately available to replace the federal courts, the initial court involvement may be seen as a way to support the creation of an oversight body like the CMA. Such a process, while not perfect, would seem to be a satisfactory, and, in the long run, cost-effective solution to the significant problems with the conditions of confinement in correctional institutions. The Court believes that this solution may lead to similar efforts in other states.

Based upon the CMA's exceptional performance over the past several years, Florida's affirmation of its continued commitment to the CMA's independence and funding, and

the CMA's representations that it has the necessary independence and support from the Defendant and the State of Florida, the Court found that the CMA is capable of performing an oversight and monitoring function over the Department in order to assure continued compliance with the orders entered in this case.

## IV. Findings

Having found that proper notice of the Special Master's recommendations regarding the entry of a final judgment and closure of this case was provided to the class members, and having found that the class members' objections do not require the Court to reject the Special Master's recommendations, and having counsels' stipulation to the terms of the Special Master's proposed final judgment and closure of this case, the Court makes the following findings:

1. The Defendant is in no less than substantial compliance with:

a. the Health Care Settlement Agreement, filed July 27, 1981, and approved by Order of this Court on November 2, 1981;

b. the injunctions set forth in the Consent Order, entered December 18, 1987;

c. the Order of July 14, 1982, relating to compliance with the Overcrowding Settlement Agreement, filed October 23, 1979, and approved by Order of this Court on February 11, 1980;

d. the Order of March 25, 1986, relating to the use of polyurethane mattresses;

e. the Order of Consent, entered May 13, 1987, relating to the Union Correctional Institution "Flat Top"; and

f. the injunctions set forth in the Fire Safety Consent Decree, entered as an Order of the Court on April 6, 1988.

2. The Department, with the CMA's oversight, has a constitutionally adequate system for the delivery of physical and mental health care to inmates in its custody.

3. The actions of the Defendant and the CMA provide assurance that there has been and will continue to be a health care delivery system that is constitutionally adequate and that incorporates the health care standards required by the agreements and relevant orders of the Court.

4. The Defendant's good faith efforts to cure his default, which resulted in his being held in contempt as set forth in the Consent Order, entered December 18, 1987, have purged the contempt found to exist, and no purpose would be served by, nor do the facts as they now exist warrant, the imposition of sanctions.

5. The Governor of the State of Florida and the Florida Legislature have fulfilled the commitments set forth in the Agreement of May 30, 1991.

As a result of these findings, and upon consideration, it is

**ORDERED AND ADJUDGED:**

1. That the Special Master's Report and Recommendation, filed October 9, 1992, is affirmed and adopted;

2. That the injunctions contained in the Order approving the 1981 Health Care Settlement Agreement, filed November 2, 1981, are vacated;

3. That the following agreements between the parties and Orders of the Court are vacated:

a. the permanent injunctions on overcrowding contained in the Order entered October 8, 1982, and contained in the Order entered February 11, 1980;

b. the Order of Consent on the Union Correctional Institution "Flat Top," entered May 13, 1987;

c. the permanent injunctions contained in the Order entered December 18, 1987;

d. the mandatory injunction contained in the Order entered March 25, 1986, relating to the use of polyurethane mattresses;

e. the Consent Order, entered December 18, 1987, joining Richard L. Dugger in his individual capacity as a party Defendant in this action; and

f. the permanent injunctions contained in the Fire Safety Consent Decree, entered as an Order of this Court on April 6, 1988;

4. That the Monitor is directed to furnish the Defendant's grievance forms to the class

members who raised individual health care objections to the entry of final judgment;

5. That the responsibilities of the Special Master and the Monitor, created by the Order of Reference entered August 22, 1985, are terminated upon the entry of final judgment in this case, subject only to paragraph 7 below;

6. That the responsibilities of class counsel, Sharon Jacobs and William J. Sheppard, appointed by Order of this Court entered May 10, 1982, are terminated, subject only to paragraph 7 below;

7. That upon entry of final judgment, the Court will retain jurisdiction solely for the purpose of:

    a. considering any application for fees or reimbursement of expenses under the Order of Reference entered August 22, 1985, or other administrative matters relating to the closure of this case, and

    b. resolving any dispute between the Defendant and class counsel concerning requests from class counsel for fees or reimbursement of expenses; and

8. That the Clerk is directed to enter a final judgment permanently closing this case and retaining jurisdiction only as to those matters enumerated in paragraph 7 of this opinion.

**DONE AND ORDERED.**